# In the United States Court of Federal Claims

No. 19-693C
(Filed Under Seal:  August 21, 2019)
(Reissued for Publication:  September 3, 2019)[*]

*****************************************
KINGFISHER SYSTEMS, INC.,       *
                              *
            Plaintiff,       *
                              *    Preaward Bid Protest; Small Business
                              *    Administration Size Determination;
      v.                   *    Cross-Motions for Judgment on the
                              *    Administrative Record
THE UNITED STATES,            *
                              *
            Defendant.     *
*****************************************

Kevin P. Mullen, Morrison & Foerster LLP, Washington, DC, for plaintiff.

Amanda L. Tantum, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

      In this preaward bid protest, plaintiff Kingfisher Systems, Inc. ("Kingfisher") challenges a size determination by the United States Small Business Administration ("SBA") that prevented the United States Navy ("Navy") from awarding Kingfisher a multiyear contract for network cyber security services.  As explained below, the SBA reasonably determined that Kingfisher did not meet the applicable size standard.  Accordingly, the court denies Kingfisher's motion for judgment on the administrative record and grants defendant's cross-motion.

---

[*]  The court issued this Opinion and Order under seal on August 21, 2019, and directed the parties to submit proposed redactions.  This reissued Opinion and Order incorporates the redactions proposed by the parties.  All redactions within the text are indicated by a bracketed ellipsis ("[. . .]").  All redactions within tables are indicated by a black box ("▄▄▄").

## I. BACKGROUND

### A. Statutory and Regulatory Context

As a bedrock principle of government contracting, the Competition in Contracting Act of 1984 generally requires federal agencies to "provide for full and open competition in soliciting offers and awarding Government contracts."  FAR 6.101(a) (2017).  A procurement provides for "full and open competition" when "all responsible sources are permitted to submit sealed bids or competitive proposals."  41 U.S.C. § 107 (2012); accord FAR 2.101 ("Full and open competition, when used with respect to a contract action, means that all responsible sources are permitted to compete.").

However, there are "certain limited exceptions" to the full-and-open-competition requirement generally applicable to federal government procurements.  FAR 6.101(a).  As relevant here, one such exception allows federal agencies to obtain goods and services "using competitive procedures, but excluding other than small business concerns."  41 U.S.C. § 3303(b); see also 15 U.S.C. § 644(a) (2012) (discussing small business procurements).  The SBA has the statutory responsibility to promulgate regulations concerning "standards by which a business concern may be determined to be a small business concern."  15 U.S.C. § 632(a)(2)(A).  Such size standards "var[y] from industry to industry to the extent necessary to reflect the differing characteristics of the various industries and consider other factors deemed to be relevant by the [SBA]."  Id. § 632(a)(3); accord 13 C.F.R. § 121.101(a) (2018) ("SBA's size standards define whether a business entity is small and, thus, eligible for Government programs and preferences reserved for 'small business' concerns.  Size standards have been established for types of economic activity, or industry, generally under the North American Industry Classification System (NAICS).").

To be eligible to receive a contract in a procurement set aside for small businesses, an offeror "must not exceed the size standard for the NAICS code specified in the solicitation."  13 C.F.R. § 121.402(a).  The size standards are "expressed in either number of employees or annual receipts," which represent the "maximum allowed for a concern and its affiliates to be considered small" under the applicable NAICS code.  Id. § 121.201.

> Receipts means all revenue in whatever form received or accrued from whatever source, including from the sales of products or services, interest, dividends, rents, royalties, fees, or commissions, reduced by returns and allowances.  Generally, receipts are considered "total income" . . . plus "cost of goods sold" as these terms are defined and reported on Internal Revenue Service (IRS) tax return forms . . . .  Receipts do not include net capital gains or losses; taxes collected for and remitted to a taxing authority if included in gross or total income, such as sales or other taxes collected from customers and excluding taxes levied on the concern or its employees; proceeds from transactions between a concern and its domestic or foreign affiliates; and amounts

> collected for another by a travel agent, real estate agent,
> advertising agent, conference management service provides,
> freight forwarder or customs broker.  For size determination
> purposes, the only exclusions from receipts are those specifically
> provided for in this paragraph.  All other items . . . may not be
> excluded from receipts.

Id. § 121.104(a); see also id. § 121.104(e) ("Unless otherwise defined in [13 C.F.R. § 121.104], all terms shall have the meaning attributed to them by the IRS.").  The SBA determines an entity's size status based on the average of the entity's annual receipts reported on its federal tax returns, including amendments, for the three most recent fiscal years.  Id. § 121.104(a)(1), (c)(1).

An offeror's size status is determined "as of the date the [offeror] submits a written self-certification that it is small . . . as part of its initial offer."  Id. § 121.404(a); see also FAR 19.301-1(a) (discussing self-certification).  After self-certifying, a qualifying offeror is "considered to be a small business throughout the life of that contract."[1]  13 C.F.R. § 121.404(g).  However, an interested party in a procurement set aside for small businesses may lodge a size status protest.  Id. § 121.1001(a)(1); FAR 19.301-1(b).  Such protests are adjudicated by the appropriate SBA Area Office ("Area Office"), and that decision is subject to review by the SBA Office of Hearings and Appeals ("Office of Hearings and Appeals").  13 C.F.R. § 121.1002; FAR 19.301-1(c); FAR 19.302(f)(1), (h).  The Office of Hearings and Appeals decision constitutes "the final decision of the SBA."  13 C.F.R. § 134.316(d).

The SBA's determination regarding size status is "binding on the contracting officer, as to whether the offeror is a small business."  FAR 19.301-1(c).  After receiving an adverse size determination, an entity is ineligible to receive any federal contract utilizing the same or a lower size standard, and may not self-certify as "small" under the same or a lower size standard, without first being recertified by the SBA.  13 C.F.R. § 121.1009(g)(5).  In addition, if an entity that receives an adverse size determination is involved in a pending procurement, the entity must notify the contracting officer of that determination.  Id.

## B.  Kingfisher's Income

Kingfisher registered with the Virginia Secretary of State on June 3, 2005.[2]  AR 538, 649. As of March 2018, its principal place of business is in Falls Church, Virginia.  Id. at 538. Kingfisher derives its revenues primarily from computer systems design services (NAICS code 541512), computer facilities management services (NAICS code 541513), other computer-related services (NAICS code 541519), and engineering services (NAICS code 541330).  Id. at 654.  For the 2015, 2016, and 2017 calendar years, Kingfisher filed its federal income tax returns

---

[1]  The life of the contract includes contract options, but does not include contract renewals or follow-on contracts.  13 C.F.R. § 121.404(g)-(h).

[2]  The court derives the facts in this section and beyond from the administrative record ("AR").

on a calendar-year basis using Form 1120S, U.S. Income Tax Return for an S Corporation.  Id. at 666 (2015), 1356 (2016), 1831 (2017).  Kingfisher reported the following income on its 2015, 2016, and 2017 tax returns:

| Item | Line | 2015 | 2016 | 2017 |
|------|------|------|------|------|
| **Gross receipts or sales** | Line 1a, Form 1120S | | | |
| **Net gain (loss) from Form 4797, line 17** | Line 4, Form 1120S | | | |
| **Other income (loss)** | Line 5, Form 1120S | | | |
| **Interest income** | Line 4, Schedule K | | | |
| **Net short-term capital gain (loss) from Sch. D** | Line 7, Schedule K | | | |
| **Net long-term capital gain (loss) from Sch. D** | Line 8a, Schedule K | | | |
| **Net section 1231 gain (loss) from Form 4797** | Line 9, Schedule K | | | |

Id. at 666-68 (2015), 1356-58 (2016), 1831-33 (2017).

On its financial statements, Kingfisher explained that during 2016, it entered into an asset purchase agreement with another entity to acquire the rights to an existing contract with the federal government, software used to perform that contract, and a lease for a sensitive compartmented information facility ("SCIF data center") for a total of $[. . .].[3]  Id. at 4053, 4070. Because the price was determined according to "expected billing to be generated under the contract," it was "to be paid in installments associated with certain events identified in the agreement, and also included a contingent amount of $[. . .] if certain performance indicators were met."  Id. at 4070.  Kingfisher paid $[. . .] in cash during 2016 and recorded the remaining $[. . .] as a liability on its 2016 financial statements.  Id. at 4043-46.  But see id. at 4070 (explaining, in a note on Kingfisher's 2017 financial statements the following year, that Kingfisher paid $[. . .] to the seller in 2016, recorded $[. . .] within accounts payable as of December 31, 2016, and included $[. . .] in long-term liabilities as of December 31, 2016).  On its 2016 tax return filed on or about March 9, 2017, Kingfisher claimed a total of $[. . .] in depreciation and amortization expenses with respect to all assets (not just those acquired as part of the $[. . .] purchase agreement) and a $[. . .] current liability "due to [. . .]."  Id. at 1356, 1363-64, 1370, 1372.

The following year, on its 2017 tax return, Kingfisher reported that it sold some of the assets it had acquired in 2016, namely, software, data, contract rights, and a SCIF data center. Id. at 1849.  Specifically, the tax return reflects that Kingfisher purchased these assets between April 1, 2016, and June 1, 2016, for an aggregate $[. . .], and sold these assets on April 1, 2017, for the same amount.  Id. at 1840 (Form 4797), 1849 (Form 4797 Statement 17).  Because

---

[3]  The court uses "financial statements" in this opinion to refer to the financial statements attached to Kingfisher's annual "Independent Accountants' Review Report."  See, e.g., AR 4041.

Kingfisher had claimed a total of $[. . .] in depreciation and amortization with respect to these assets between their acquisition and sale dates, the assets' total adjusted basis as of the date of sale was $[. . .] ($[. . .] acquisition price less $[. . .] in depreciation and amortization). Id. at 1840.  Accordingly, Kingfisher recognized an ordinary gain of $[. . .] ($[. . .] sales price less $[. . .] adjusted basis) on the April 1, 2017 asset sale on Form 4797, Part II, id., and entered this amount on Line 4 of its Form 1120S, id. at 1831, as shown below:

| (a) Description of property | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) | (d) Gross sales price | (e) Depreciation allowed or allowable since acquisition | (f) Cost or other basis, plus improvements and expense of sale | (g) Gain or (loss) Subtract (f) from the sum of (d) and (e) |
|---|---|---|---|---|---|---|

**Part II**   **Ordinary Gains and Losses**

10  Ordinary gains and losses not included on lines 11 through 16 (include property held 1 year or less):

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| STATEMENT 17 | | | ████████████████████ | | | |

```
FORM 4797                    ORDINARY GAINS AND LOSSES              STATEMENT 17


        DESCRIPTION         DATE        DATE      SALES    DEPR      COST      GAIN
        OF PROPERTY         ACQUIRED    SOLD      PRICE    ALLOWED  OR BASIS  OR LOSS

SCIF DATA CENTER           06/01/16  04/01/17   ████████████████████████████████
SOFTWARE                   04/01/16  04/01/17   ████████████████████████████████
DATA                       04/01/16  04/01/17   ████████████████████████████████
CONTRACT RIGHTS            04/01/16  04/01/17   ████████████████████████████████

TOTALS TO FORM 4797, LINE 10                    ████████████████████████████████
```

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Income | 1 a | Gross receipts or sales ... | b | Return and allowances | c Bal. Subtract line 1b from line 1a | 1c | ████ |
| | 2 | Cost of goods sold (attach Form 1125-A) | | | | 2 | |
| | 3 | Gross profit. Subtract line 2 from line 1c | | | | 3 | |
| | 4 | Net gain (loss) from Form 4797, line 17 (attach Form 4797) | | | | 4 | |
| | 5 | Other income (loss) (attach statement) | | | | 5 | |
| | 6 | Total income (loss). Add lines 3 through 5 | | | | 6 | ████ |

Further, Kingfisher indicated that the $[. . .] liability to [. . .] did not exist as of December 31, 2017.  Id. at 1834, 1846.  Kingfisher filed its 2017 tax return on or about March 15, 2018.  Id. at 1827, 1829.

Within its 2017 financial statements, Kingfisher explained that the $[. . .] "sale" on April 1, 2017, was not actually a sale but rather a purchase price adjustment.  See id. at 4070. Specifically, Kingfisher noted that it had entered into the $[. . .] asset purchase agreement in 2016, but the purchase price was retroactively adjusted from $[. . .] to $[. . .] pursuant to a March 2017 evaluation of contract billings.  Id.  Accordingly, Kingfisher "reduced the basis of the

assets and the corresponding liability for the remaining amount due" by an amount equal to the $[. . .] reduction.  Id.; see also id. at 4059 (reporting a "[c]ontingent purchase obligation" of $0 as of December 31, 2017).

### C.  The Solicitation and Apparent Award

On September 5, 2018, the Navy issued Request for Proposals N66001-18-R-0011 to acquire network cyber security services for one base year and four option years.  Id. at 1-4, 7, 83.  The procurement was designated as a total small business set-aside.  Id. at 81, 123.  The Navy assigned the procurement NAICS code 541512, which has a small business size standard of $27.5 million in average annual receipts.  Id. at 98; accord 13 C.F.R. 121.201.  The Navy amended the solicitation multiple times and set October 23, 2018, as the due date for proposals.  AR 190.  Kingfisher submitted its proposal on that date.  Id. at 641.

After receiving and evaluating proposals, the Navy, in a January 25, 2019 preaward notice, informed offerors that it had selected Kingfisher as the apparent awardee.  Id. at 279.

### D.  Size Protest and Appeal

On January 31, 2019, another offeror—Agile-Bot II, LLC ("Agile-Bot")—lodged a size protest with the contracting officer.  Id. at 280-81.  The contracting officer forwarded the protest to the SBA that same evening.  Id. at 585; see also 13 C.F.R. § 121.1003 (providing that size protests are lodged with the contracting officer, who must then forward such protests to the SBA); FAR 19.302(c)(1) (same).

Agile-Bot suggested that "Kingfisher's annual receipts exceed the size standard assigned to the [solicitation], rending it ineligible for award," according to "publicly available information."  AR 283.  Agile-Bot further argued that Kingfisher was "affiliated with multiple companies . . . which add millions of dollars to Kingfisher's total combined annual receipts via this common ownership, management, and control."  Id.  Kingfisher responded on February 9, 2019, contending that its annual receipts for the three years at issue (2015, 2016, and 2017) "squarely fit[] within the applicable size standard" of $27.5 million:

| Time Frame | Total Revenue |
|---|---|
| Fiscal Year 2015 | |
| Fiscal Year 2016 | |
| Fiscal Year 2017 | |
| **Three-Year Average** | |

Id. at 642.  Kingfisher further remarked that it did not have affiliates.  Id. at 643.  Kingfisher attached its federal income tax returns and financial statements for 2015, 2016, and 2017 to its response.  See id. at 641.

On February 13, 2019, the Area Office rejected Agile-Bot's affiliation arguments, id. at 4306-07, and considered whether Kingfisher's receipts met the applicable size standard based on Kingfisher's "federal income tax returns . . . for the three years prior to its offer," id. at 4307. The Area Office calculated Kingfisher's receipts as follows:



Id. at 4302.  After quoting 13 C.F.R. 121.104, the Area Office explained:

> Kingfisher provided federal income tax returns for itself for the three years prior to its offer for this procurement, as well as a completed SBA Form 355.  Kingfisher also provided its own calculation for its three year average in its response; however, the Area Office notes that Kingfisher's calculations for its receipts are incorrect.  It appears that Kingfisher used line 1a of its tax returns rather than calculating its receipts in the manner required by regulation at 13 CFR § 121.104(a).  When this error is corrected, Kingfisher's three year average exceeds the size standard.

Id. at 4307-08.  The Area Office transmitted its decision to Kingfisher and Agile-Bot on February 15, 2019.  Id. at 4309.

Kingfisher timely appealed the Area Office's decision to the Office of Hearings and Appeals on February 28, 2019.  Id. at 4312.  See generally id. at 4313-26 (appeal petition).  Kingfisher based its appeal on two primary arguments.  First, Kingfisher suggested that the dispute centered on the import of Line 4 of its 2017 tax return, where it had "reported $[. . .] as a net gain from the sale of business property," and emphasized that it "properly did not include this amount in its calculation of receipts for 2017."  Id. at 4318.  Kingfisher explained that "the Area Office failed to recognize that the $[. . .] reported gain was not a 'receipt,' but instead arose from a reduction in the price of business property Kingfisher purchased in 2016."  Id. at 4319.  According to Kingfisher, "the $[. . .] depreciation reversal was merely an accounting correction to reverse depreciation allowed to Kingfisher on its 2016 and 2017 tax returns" and thus "was properly excluded from Kingfisher's calculations because it does not reflect any actual economic gains or receipt of proceeds from the sale of property."  Id. at 4320-21.  Kingfisher averred that the "depreciation reversal . . . was plainly indicated" as a depreciation reversal, rather than a receipt, on its 2017 tax return.  Id. at 4321.  Second, Kingfisher asserted that the decision was deficient because "the Area Office failed to apprise Kingfisher of the basis for the adverse Size Determination."  Id. at 4324.

The Office of Hearings and Appeals issued its decision on May 2, 2019, id. at 4392, and provided a redacted version for public release five days later, id. at 4415, 4423.  See generally id. at 4416-22 (containing a complete copy of the public version of Kingfisher Sys., Inc., SBA No. SIZ-6003 (May 2, 2019)).  In its decision, the Office of Hearings and Appeals observed:

> For fiscal years 2015 and 2016, the amounts [Kingfisher] identified as "Total Revenue" in its protest response correspond exactly with the amounts [Kingfisher] reported as "Total income" on line 6 of its Federal income tax return, Form 1120S. [Kingfisher's] 2017 tax return, though, showed a "Total income" of $[. . .].  This amount included $[. . .] of gross receipts and an additional $[. . .] labeled "Net gain (loss) from Form 4797, line 17."

Id. at 4394 (citations omitted).  After noting that its standard of review is whether the Area Office's determination was "based upon a clear error of fact or law," id. at 4397 (citing 13 C.F.R. § 134.314), the Office of Hearings and Appeals explained:

> [Kingfisher] made no argument to the Area Office as to the manner in which [Kingfisher] believed its receipts should be calculated. [Kingfisher] provided the Area Office a table purporting to show [Kingfisher's] "Total Revenue" for each of the three fiscal years under review, but offered no explanation as to how [Kingfisher] arrived at those figures.  Further, although [Kingfisher] acknowledges on appeal that receipts normally will be the same as total income, [Kingfisher] did not contend to the Area Office that its receipts should be different than the total income shown on its tax returns.  In addition, for two of the three years under review,

the amounts [Kingfisher] itself identified as "Total Revenue"
corresponded exactly with the amounts [Kingfisher] reported as
total income on line 6 of its Federal income tax returns.  On this
record, then, it was reasonable for the Area Office to conclude that
the amount [Kingfisher] cited as its 2017 "Total Revenue" was in
error, perhaps because [Kingfisher] had referenced the wrong line
of its 2017 tax return.  Accordingly, [Kingfisher] has not shown
reversible error in the size determination. . . .  [I]f [Kingfisher]
wished to argue for adjustments to the amounts shown on its tax
returns, it was incumbent upon [Kingfisher] to raise such
arguments to the Area Office, and to prove the validity of those
adjustments.

. . .  [B]y choosing not to provide any explanation on this
issue, [Kingfisher] assumed the risk that the Area Office would not
understand that [Kingfisher] believed the "Net gain" of $[. . .]
should be excluded from [Kingfisher's] 2017 receipts.

Id. at 4398 (citations omitted).  Accordingly, the SBA Office of Hearings and Appeals denied
Kingfisher's appeal and affirmed the size determination.  Id. at 4399.

### E.  Procedural History

Following receipt of the SBA final decision, Kingfisher filed the instant protest on May
10, 2019.  After agreeing to stay award of the contract at issue pending the outcome of this
protest, defendant filed the administrative record on May 20, 2019.  The parties then briefed
cross-motions for judgment on the administrative record, and the court heard argument on
August 20, 2019.[4]  The parties' cross-motions are now ripe for adjudication.

---

[4] During briefing on the parties' cross-motions, Kingfisher moved to supplement the
administrative record with an affidavit provided by a partner at its outside accounting firm.  The
court denied that motion on June 3, 2019.  Nevertheless, Kingfisher relies on portions of that
affidavit even though it is extra-record evidence.  Thus, the court disregards Kingfisher's
arguments made in reliance on that affidavit to the extent that those arguments are not supported
in the administrative record.

## II.  STANDARD OF REVIEW

In bid protests, the United States Court of Federal Claims ("Court of Federal Claims") reviews the agency action at issue pursuant to the standards set forth in 5 U.S.C. § 706.[5]  28 U.S.C. § 1491(b)(4).  Although Section 706 includes several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004); accord Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016).  Under this standard, the court

> may set aside a procurement action if (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.  A court reviews a challenge brought on the first ground to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.  When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations and internal quotation marks omitted); see also Turner Constr. Co. v. United States, 645 F.3d 1377, 1384-85 (Fed. Cir. 2011) (explaining that reviewing courts conduct a "rational basis" review of the agency action at issue, rather than an "independent de novo assessment"); Advanced Data

---

[5]  Defendant does not contest the court's jurisdiction to entertain the subject matter of this bid protest.  Under the Tucker Act, the Court of Federal Claims

> shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (2012).  Accordingly, the court possesses subject-matter jurisdiction to entertain this protest.  Further, Kingfisher plainly has standing to maintain this protest.  See Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (explaining that standing in a bid protest is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract" (quoting Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001))).

Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (observing that the "arbitrary and capricious" standard is "highly deferential" and requires courts to sustain agency actions that demonstrate "rational reasoning and consideration of relevant factors"). Generally, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."[6] Camp, 411 U.S. at 142; accord Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009).

## III.  ANALYSIS

Kingfisher advances two arguments in support of its request that the court overturn the SBA's size determination. First and foremost, Kingfisher contends that it did not exceed the $27.5 million threshold because the $[. . .] gain reported on Line 4 of its 2017 Form 1120S should not be counted as part of its gross receipts. According to Kingfisher, the proper treatment of the $[. . .] gain was apparent from the information contained within its tax return. Second, Kingfisher posits that the SBA's process in reaching the size determination was inadequate because the Area Office failed to consider all pertinent information, misunderstood Kingfisher's 2017 tax return, and failed to sufficiently explain why it believed Kingfisher's calculation was incorrect.

### A.  The SBA's Methodology Was Proper

Before addressing Kingfisher's merits argument, the court turns to Kingfisher's process argument wherein Kingfisher stresses that the SBA's methodology in reaching its conclusion was defective. Kingfisher is mistaken. The SBA properly limited the Kingfisher size determination to the four corners of Kingfisher's tax returns. Further, the SBA sufficiently explained its reasoning.

As Kingfisher correctly observes, applicable regulations provide that the SBA "must" use a business concern's federal tax returns in reaching a size status determination, 13 C.F.R. § 121.104(a)(1), and additional information such as accounting records, financial statements, and affidavits are only to be used "[w]hen a concern has not filed a Federal income tax return with the IRS for a fiscal year which must be included in the period of measurement," id. § 121.104(a)(2). There is no dispute that 2015, 2016, and 2017 are the proper years of consideration because Kingfisher files its tax returns on a calendar-year basis and submitted its response to the solicitation (wherein it self-certified as meeting the applicable size standard) on October 23, 2018. There is also no dispute that Kingfisher had no outstanding (i.e., unfiled) tax returns as of that date. Therefore, the SBA properly focused solely on Kingfisher's 2015, 2016, and 2017 tax returns in making its size determination. Kingfisher's insistence that the Area

---

[6] An administrative record typically contains the materials developed and considered by an agency in making a decision subject to judicial review. See Camp v. Pitts, 411 U.S. 138, 142-43 (1973) (remarking that an agency's finding must be "sustainable on the administrative record made" by the agency at the time of its decision); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 345, 349-50 (1997) ("[T]he primary focus of the court's review should be the materials that were before the agency when it made its final decision.").

Office should have "made an[] effort to confirm the accuracy of Kingfisher's receipts calculation," Mem. Supp. Pl.'s Mot. J. Administrative R. ("Pl.'s MJAR") 7, rings hollow. Because it had access to all of the pertinent tax returns, the Area Office would have violated 13 C.F.R. § 121.104(a)(2) had it considered documents beyond Kingfisher's tax returns, such as Kingfisher's financial statements.

Kingfisher stresses that it "provided the Area Office with all of the information [the Area Office] requested and needed to determine the accuracy of the receipts calculations." Id. at 13. By doing so, Kingfisher appears to suggest that the SBA erred in not considering, in addition to its tax returns, the financial statements that it submitted to the Area Office containing an explanation of the $[. . .] asset purchase agreement and subsequent retroactive purchase price reduction. See AR 4325 (reflecting Kingfisher's argument to the Office of Hearings and Appeals that there was no evidence that the Area Office "understood the $[. . .] gain arose from a purchase price reduction"). Such a suggestion evinces flawed reasoning. As noted above, although Kingfisher's financial statements were before the Area Office, it would have been improper for the Area Office to consider them. To the extent Kingfisher suggests that its tax returns, standing alone (as they must do), contained "all the information" necessary for the SBA to make a proper decision and that the SBA misunderstood those returns, Kingfisher maintains an argument addressing the merits of the SBA's determination, not its process. See infra Section III.B (discussing the merits of the SBA's size determination).

Because the SBA properly limited its analysis to Kingfisher's tax returns, the explanations provided by the Area Office and the Office of Hearings and Appeals were sufficiently detailed. As noted above, the Office of Hearings and Appeals observed that Kingfisher "made no argument to the Area Office as to the manner in which [Kingfisher] believed its receipts should be calculated." AR 4398. With respect to its annual revenues, Kingfisher merely provided the Area Office with a table listing the respective amounts for 2015, 2016, and 2017. The values in that table coincided with discrete entries on Kingfisher's tax returns. Kingfisher provided no further argument to the Area Office pertaining to the character of the $[. . .] gain, thus choosing to rest on the information contained within its tax returns. Although Kingfisher also submitted its financial statements containing an explanation of the $[. . .] gain to the Area Office, the Area Office could not properly consider them. Therefore, the Office of Hearings and Appeals' observation regarding Kingfisher's failure to provide support for its position regarding gross receipts to the Area Office was accurate. Assuming (for the sake of argument only) that the SBA's decisions lacked detail, that shortcoming was harmless error. Kingfisher's submissions—both to the SBA and this court—demonstrate Kingfisher's understanding that, at bottom, the SBA believed the $[. . .] gain should be included within its gross receipts for size determination purposes. In other words, Kingfisher knew what it was up against; it cannot now argue otherwise.

In addition, Kingfisher takes issue with the final paragraph of the Office of Hearings and Appeals' decision:

> Lastly, it is worth noting that [Kingfisher] has not established that it is, in fact, proper to exclude the $[. . .] from the calculation of [Kingfisher's] average annual receipts. While it may be true, as [Kingfisher] contends, that the $[. . .] does not reflect economic gains from the sale of property, [Kingfisher] nevertheless acknowledges that it reported the $[. . .] as income during 2017 in order to partially reverse depreciation deductions that [Kingfisher] had claimed in prior years. Logically, if the depreciation had been correctly reported in prior years, [Kingfisher's] receipts in those prior years would have been correspondingly higher. Accordingly, [Kingfisher] has not persuasively explained why it would be appropriate to exclude the $[. . .] from [its] receipts for 2017, but not to make any upward adjustments to [its] receipts for prior years.

Id. (citation omitted). As Kingfisher highlights, these observations are incorrect. First, Kingfisher avers that it was attempting to reverse depreciation deductions claimed in both 2016 and 2017 on its 2017 tax return, not just depreciation deductions for prior years. Second, the Office of Hearings and Appeals' comment regarding upward adjustments reflects a misunderstanding of depreciation deductions. Depreciation deductions are not tied to gross receipts or income.[7] Accordingly, if Kingfisher had reported a different amount of depreciation than it did in 2016, its gross receipts for that year would have been unchanged.

However, the correctness of Kingfisher's argument regarding the final paragraph of the Office of Hearings and Appeals' decision is irrelevant to the merits of its protest. The Office of Hearings and Appeals did not, as Kingfisher remarks, "affirm the Area Office's decision on this basis." Pl.'s MJAR 8. Rather, the Office of Hearings and Appeals was reviewing the Area Office decision under a "clear error" standard pursuant to 13 C.F.R. § 134.314, rather than a de novo standard. Its discussion regarding the Area Office's review served as the basis for its decision; the final paragraph was merely dicta. Indeed, the Office of Hearings and Appeals indicated as such at the beginning of that paragraph, stating that it was simply "worth noting" its observations therein. AR 4398.

---

[7] Unlike depreciation, an election to wholly or partially expense certain property under section 179 of the Internal Revenue Code is limited by business income. Compare 26 U.S.C. § 167 (2012) (allowing a depreciation deduction), and id. § 168 (calculating the allowable depreciation deduction), with id. § 179(b)(3) (business income limitation on the "section 179" deduction).

In sum, the Area Office properly limited its analysis to Kingfisher's tax returns while disregarding Kingfisher's financial statements, the Office of Hearings and Appeals analyzed the Area Office decision under the appropriate standard, and the basis for both decisions was clear to Kingfisher.

## B. The SBA Reasonably Determined That Kingfisher Exceeded the Applicable Size Standard

The crux of this protest is Kingfisher's argument that the SBA improperly reviewed Kingfisher's 2017 tax return and committed clear error by including the $[. . .] gain reported on that return in its calculation of Kingfisher's gross receipts. The court must therefore consider whether the Area Office's interpretation of the $[. . .] gain as reflected on Kingfisher's 2017 tax return lacked a rational basis.

As an initial matter, the court observes that Kingfisher does not contend that a gain resulting from a sale of business property is not properly included in gross receipts for size determination purposes. Thus, assuming that the SBA reasonably interpreted Kingfisher's $[. . .] gain as arising from such a sale, Kingfisher would not challenge the inclusion of that amount in its gross receipts. Rather, Kingfisher draws a distinction between (1) "the sale or disposition of business property" and (2) a "depreciation reversal" that arises from a purchase price reduction. Pl.'s MJAR 6. It emphasizes that neither a purchase price reduction nor a resulting depreciation reversal "bears any resemblance to any of the types of revenue . . . cited in 13 C.F.R. § 121.104(a)." Id.; see also id. (describing the depreciation reversal as "merely an accounting correction"). However, despite Kingfisher's averments otherwise, the SBA's interpretation of Kingfisher's 2017 tax return was reasonable for three independent reasons.

### 1. The Area Office Reasonably Interpreted the $[. . .] Entry as Gain From a Sale

First, the information contained in Kingfisher's 2017 tax return provided no indication that the April 1, 2017 transaction reported therein was not what it appeared to be—a sale of four assets. Although the sale price was equal to the acquisition cost for each asset, the assets identified as having been sold on April 1, 2017, were identified as having been acquired on April 1, 2016, and June 1, 2016. Thus, as reported, the assets were sold soon after they were acquired. Accordingly, it was not unreasonable for the SBA to believe that the fair market value of the assets did not change during that time and that Kingfisher simply used the proceeds of the sale to extinguish the $[. . .] debt that had existed at the beginning of the year.[8] Further, Kingfisher attached a statement to its 2017 tax return containing details of the transaction, but nowhere in that statement (or elsewhere on the return) did Kingfisher explain that the transaction reported as a sale on Form 4797 was not actually a sale.

---

[8] That the gain on the supposed sale of each asset was equal to its prior depreciation is of no moment; this result occurs mathematically when the sale price is equal to the acquisition cost. See 26 U.S.C. § 1011(a) (providing that "gain or loss from the sale or other disposition of property, whenever acquired" is determined using its adjusted basis).

**2.  Kingfisher's Alleged "Depreciation Reversal" Reflects an Unusual Approach**

Second, a "depreciation reversal" is not the normal tax treatment when there is a purchase price reduction after the close of the year in which an asset is acquired (as Kingfisher avers). Rather, the normal tax treatment is simply to reduce the basis of the asset.  See Dep't of the Treasury, Publication 946 (2017):  How to Depreciate Property ("Pub. 946") 13 (Feb. 28, 2018) ("If you deduct more depreciation than you should, you must reduce your basis by any amount deducted from which you received a tax benefit . . . ."). Therefore, the SBA was not unreasonable in failing to interpret the transaction reported on Kingfisher's Form 4797 for 2017 as a mere accounting correction when, as noted above, there was no indication as such.

When purchase-money debt owed to a seller is reduced (as Kingfisher alleges), and not pursuant to bankruptcy or when the purchaser is insolvent (neither of which Kingfisher alleges), such a reduction is not treated as cancellation-of-debt income under the Internal Revenue Code but rather as a purchase price reduction.  26 U.S.C. § 108(e)(5).  An after-the-fact "adjustment[] to the sales price . . . reduce[s] the basis" of that item of property.  Dep't of the Treasury, Publication 551:  Basis of Assets 5 (Dec. 2016).  The Internal Revenue Service provides specific guidance regarding how to depreciate property when the basis of an asset must be adjusted "for any reason" other than normal allowable depreciation or making improvements.  Pub. 946 at 40. In such a situation, the depreciation for that asset must be computed manually.[9]  Id.

Publication 946 contains a representative example that applies to various situations where the basis of property must be reduced.  See id.  In the example, an event occurred in July 2017 requiring the taxpayer to reduce her adjusted basis.  Id.  Rather than amending her 2016 return or reporting a "depreciation reversal" on her 2017 return to reflect the excess depreciation claimed in 2016 as a result of the subsequent basis reduction, the hypothetical taxpayer "must now figure her depreciation for 2017 without using the percentage tables."  Id.  The hypothetical taxpayer leaves the 2016 depreciation intact and simply has lower depreciation deductions beginning in 2017 and continuing for the remaining life of the asset.  See id. at 43-47 ("Figuring the Deduction Without Using the Tables").  In other words, the first-year excessive depreciation due to the subsequent purchase price reduction is offset with lower allowable deprecation in future years.[10]

---

[9]  This is not to suggest that Kingfisher's reporting of the alleged depreciation reversal was necessarily improper.  Kingfisher may have simply been attempting to adhere to the tax benefit rule.  See Hillsboro Nat'l Bank v. Comm'r, 460 U.S. 370, 377-79 (1983) (discussing the tax benefit rule, which addresses situations in which "an apparently completed transaction will reopen unexpectedly in a subsequent taxable year, rendering the initial reporting improper"). However, the substantive issue in the instant protest is not whether Kingfisher properly reported the alleged purchase price reduction, but whether the Area Office's interpretation of Kingfisher's reporting was reasonable.

[10]  There would be depreciation recapture if the amount of the purchase price reduction was greater than the amount of the remaining adjusted basis, but that is not what happened in either the hypothetical example in Publication 946 or with Kingfisher in 2016 and 2017.

Kingfisher's alternative argument regarding its alleged "depreciation reversal" fares no better.  At a minimum, Kingfisher posits, the portion of its "depreciation reversal" attributable to 2017 depreciation (as opposed to the portion attributable to 2016 depreciation) should not be treated as a receipt because it "was just an elimination of a deduction being claimed in the same tax return."  Pl.'s MJAR 9.  It would be unusual for a taxpayer to partially offset an excessive deduction by reporting phantom income in the same tax year rather than simply claiming a lower deduction.[11]  (Such an approach is not necessarily improper because either path results in the same taxable income.  The approach could be problematic, though, if a taxpayer artificially increased income to impermissibly inflate other deductions.)  Therefore, the SBA's failure to interpret Kingfisher's 2017 tax return in such a manner was not unreasonable.  The SBA simply took Kingfisher's 2017 tax return at face value, as it must do.

### 3. The SBA Properly Included Kingfisher's Alleged "Depreciation Reversal" Within Kingfisher's Receipts

In any event, defendant stresses, even under Kingfisher's proffered interpretation of the $[. . .] gain that Kingfisher reported on its 2017 tax return, Kingfisher still cannot prevail in this protest because its alleged "depreciation reversal" income cannot be excluded from total income.  Defendant is correct.

As noted above,

> Receipts means all revenue in whatever form received or accrued from whatever source, including from the sales of products or services, interest, dividends, rents, royalties, fees, or commissions, reduced by returns and allowances.  Generally, receipts are considered "total income" . . . plus "cost of goods sold" as these items are defined and reported on Internal Revenue Service (IRS) tax return forms . . . .

13 C.F.R. § 121.104(a).  This list of various sources of revenue is, by its own terms, not exhaustive.[12]  For entities that file Form 1120S, the SBA must base a size determination on the sum of line 6 (total income) and line 2 (cost of goods sold), unless some of the income can be excluded.

> Receipts do not include net capital gains or losses; taxes collected for and remitted to a taxing authority if included in gross or total income, such as sales or other taxes collected from customers and excluding taxes levied on the concern or its employees; proceeds

---

[11]  For example, taxpayers "cannot depreciate . . . [p]roperty placed in service and disposed of in the same year."  Pub. 946 at 6.

[12]  Kingfisher's reliance on 26 U.S.C. § 108(e)(5) reflects a tacit acknowledgement that "total income" is a far-reaching concept.

> from transactions between a concern and its domestic or foreign
> affiliates; and amounts collected for another by a travel agent, real
> estate agent, advertising agent, conference management service
> provides, freight forwarder or customs broker.  For size
> determination purposes, the only exclusions from receipts are those
> specifically provided for in this paragraph.  <u>All other items . . .
> may not be excluded from receipts</u>.

Id. (emphasis added).  The only receipts that can be excluded from the computation of "receipts" for size determination purposes are specifically enumerated.  Like gain from the sale of business property, "depreciation reversal" income is not on that list.

Therefore, even if the $[. . .] gain forming part of the "total income" that Kingfisher reported on its 2017 tax return was actually a depreciation reversal, the SBA did not err by including that amount in its computation of Kingfisher's receipts for size determination purposes.

### C.  Kingfisher Is Not Entitled to Injunctive Relief

Having ruled on the merits of Kingfisher's protest, the court turns to Kingfisher's request for permanent injunctive relief.

The Court of Federal Claims has the authority to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2), and is guided in making such an award by Rule 65 of the Rules of the United States Court of Federal Claims.  In determining whether to award a permanent injunction, the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships favors granting injunctive relief, and (4) it is in the public interest to grant injunctive relief. Centech, 554 F.3d at 1037.  The protestor bears the burden of establishing the factors by a preponderance of the evidence.  Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. 643, 654 (2014); Textron, Inc. v. United States, 74 Fed. Cl. 277, 287 (2006).

Although an award of injunctive relief is based on the consideration of a four-factor test, a plaintiff's failure to achieve success on the merits is dispositive.  See PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (explaining that a plaintiff "must [have] succeeded on the merits of the case" in order to be granted permanent injunctive relief); Career Training Concepts, Inc. v. United States, 83 Fed. Cl. 215, 219 (2008) ("[A] permanent injunction requires actual success on the merits.") (collecting cases).  Since Kingfisher has not achieved success on the merits of its protest, it is not entitled to injunctive relief.[13]  Thus, the court need not address the remaining factors or the scope of Kingfisher's request.

---

[13] Kingfisher can nevertheless petition the SBA for a new size determination, based on its 2016, 2017, and 2018 tax returns, that would inform its eligibility for future procurements that are set aside for small businesses.

## IV.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, meritless, or unnecessary for resolving the issues currently before the court.

The SBA did not act arbitrarily, capriciously, or erroneously in determining that Kingfisher does not meet the $27.5 million size standard to be considered a small business for purposes of the instant procurement.  The Area Office properly based its size determination on Kingfisher's "total income" as reported on line 6 of its Form 1120S for 2015, 2016, and 2017.  The Area Office properly limited its analysis to the four corners of Kingfisher's tax returns, and it was not unreasonable for the Area Office to interpret the $[. . .] gain on Kingfisher's 2017 tax return as other than what it purported to be—gain from the sale of business assets.  Further, the Office of Hearings and Appeals applied the correct standard of review by declining to consider arguments that Kingfisher did not advance before the Area Office, and reasonably found no error in the Area Office's conclusions.  Because Kingfisher fails on the merits of its protest, it is not entitled to injunctive relief.

Therefore, the court **DENIES** Kingfisher's motion for judgment on the administrative record and **GRANTS** defendant's cross-motion.  No costs.  The clerk is directed to enter judgment accordingly.

The court has filed this opinion under seal.  The parties shall confer to determine proposed redactions that are agreeable to all parties.  Then, **no later than Wednesday, September 4, 2019**, the parties shall file a joint status report under seal indicating their agreement with the proposed redactions and **attaching a complete copy of the court's opinion with all redactions clearly indicated**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge